**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 20-218-14 |
| | ) | |
| ALEXIS A. PEREZ LOPEZ | ) | |

**MEMORANDUM OPINION**

Presently before the Court is Defendant Alexis A. Perez Lopez's Motion to Suppress Evidence and Statements, along with a Supplement thereto, which is opposed by the Government. (Docket Nos. 1388, 1439, 1440 at 9-17). After careful consideration of Defendant's Motion, the transcript of the suppression hearing, (Docket Nos. 1652, 1923), and the credible evidence of record adduced at that proceeding, along with the parties' post-hearing written submissions, (Docket Nos. 1960, 1962), Defendant's Motion will be denied in its entirety.

## I. BACKGROUND

### A. Procedural History

Defendant and 26 others are charged in Count One of the Indictment with conspiracy to possess with intent to distribute and distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846, for conduct occurring from in and around October 2018 until in and around June 2020. (Docket No. 3). In September 2020, Defendant was arrested in the Central District of California, he had a detention hearing there and was ordered to be detained pending trial or other disposition of this matter, and he also was ordered to be removed to this District. (Docket Nos. 148-5, 148-9, 148-10). After Defendant arrived here, Attorney John Halley was appointed to represent him, he was arraigned on October 29, 2020, and he pled not guilty to the charge. (Docket Nos. 294, 306, 308). Given the volume of discovery involved in this multi-defendant case,

Defendant sought, and was granted, numerous extensions of time to file pretrial motions. (Docket Nos. 310, 442, 593, 683, 761, 817, 934, 1010, 1107, 1206, 1307).

Defendant ultimately filed a Motion to Suppress Evidence and Statements seeking to suppress evidence that was obtained following a search of his residence and vehicles on September 2, 2020, as well as any statements he made at the scene. (Docket No. 1388 at 5). In support, Defendant argues that agents unlawfully entered his residence and coerced him to give consent to search his residence and vehicles in violation of his Fourth Amendment rights. (*Id.*, ¶ 11). Defendant also contends that he was pressured and compelled to provide incriminating statements in violation of his Fifth Amendment rights. (*Id.*).

The Government advocates that suppression is unwarranted because: (1) agents lawfully entered Defendant's residence on September 2, 2020, given that they had a valid warrant to arrest him, probable cause that the residence was being utilized by him, and probable cause that he was present in the residence before they entered; (2) the evidence was seized pursuant to Defendant's voluntary consent to search the residence and the vehicles; and (3) an agent advised Defendant of his *Miranda* rights in Spanish, he expressed an understanding of his rights, and he voluntarily agreed to speak with the agents. (Docket No. 1440 at 10-17).

Due to the disputed nature of these matters, the Court convened a suppression motion hearing on November 17, 2023, at which time the Government presented testimony by four law enforcement witnesses, entered three exhibits into evidence, and then rested. (Docket Nos. 1564, 1564-1). Attorney Halley requested that the record by kept open to consider whether the defense would present any witnesses, and the Government did not object. (Docket No. 1564). Accordingly, the Court continued the proceeding and scheduled it to reconvene on December 13, 2023. (*Id.*).

Prior to that time, however, Attorney Halley filed a motion to withdraw as counsel. (Docket Nos. 1565, 1566). Following a hearing on Attorney Halley's motion to withdraw on December 8, 2023, the Court granted his motion and appointed Attorney Daniel Cuddy to represent Defendant. (Docket Nos. 1580, 1581, 1587). Given Attorney Cuddy's new appointment, the Court granted Defendant's motion to continue the suppression hearing and specified that it would be rescheduled by further order of Court to allow Attorney Cuddy ample time to review Defendant's case and confer with him concerning next steps. (Docket No. 1586).

Defendant subsequently filed motions for extension of time to file pretrial motions for the time period from February 5, 2024 to February 4, 2025, which the Court granted. (Docket Nos. 1634, 1728, 1798, 1868). In the interim, the continuation of the hearing on Defendant's Motion to Suppress was held on January 14, 2025, during which the defense presented testimony by Alexis Perez-Carbajal and then rested. (Docket No. 1900). At the Court's direction, the parties subsequently filed proposed findings of fact and conclusions of law on Defendant's Motion to Suppress, as ordered. (Docket Nos. 1901, 1935, 1951, 1958, 1960, 1962). Defendant also continued to file motions for extension of time to file additional pretrial motions for the time period from February 3, 2025 to March 30, 2026, which the Court granted. (Docket Nos. 1913, 1987, 2017, 2063, 2098, 2125, 2152).

Ultimately, on March 30, 2026, Defendant filed nine additional pretrial motions. (Docket Nos. 2181, 2182, 2184, 2185, 2189, 2191, 2192, 2199, 2202). After the Court ordered briefing on Defendant's additional pretrial motions, the Government sought extensions of time to file its omnibus response, which was filed on June 8, 2026. (Docket Nos. 2204, 2222, 2229, 2238, 2240, 2242). The defense consented to the Government's requested extensions of time to respond, (Docket Nos. 2216, ¶ 5; 2228, ¶ 7; 2237, ¶ 7; 2239), and Defendant was given an opportunity to

file a reply by June 22, 2026, if he wished to do so. (Docket No. 2204, 2222, 2229, 2238, 2240). The Court then ruled on Defendant's additional pretrial motions, (Docket Nos. 2263, 2264, 2265, 2269, 2271, 2272), and it also entered rulings on the pretrial motions filed by co-defendant Jamaal Maragh with whom Defendant is joined for trial. Defendant's Motion to Suppress is now ripe for disposition.

**B. <u>Facts</u>**

The Government presented testimony at the suppression hearing by law enforcement witnesses Jose Calderon, Robert Poindexter, Marco Oropeza, and Olga Alvarado concerning surveillance that occurred in the months prior to September 2, 2020, and the events of that day, and it entered Government Exhibits 1, 2, and 3 into evidence. (Docket Nos. 1564, 1564-1). In turn, Defendant presented testimony by his son, Alexis Perez Carbajal. (Docket No. 1900).

Before summarizing the testimonial evidence, the Court notes that it evaluates the credibility of the witnesses who testified at the hearing consistent with certain well-established principles. Broadly stated, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted). More specifically, as finder of fact, the Court "is free to accept or reject any or all of a witness's testimony." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) (citation omitted). To that end, "[c]redibility determinations are to be made in consideration of numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony

in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic." *Id.* Additionally, a witness' testimony is not to be judged more or less credible because the witness is a law enforcement officer. *Id.* at 569-70 (citations omitted).

Considering the demeanor and testimony of each of the law enforcement witnesses in response to the questioning of the attorneys at the suppression hearing, as well as the other salient factors just discussed, the Court finds that they each offered credible testimony concerning their recollection of events that occurred in the months prior to September 2, 2020, and the events that unfolded that day, despite opposing counsel's efforts to impeach them. *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) ("[W]hen findings are based on determinations regarding the credibility of witnesses . . . for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.") (quoting *Anderson v. City of Bessemer,* 470 U.S. 564, 575 (1985)). Conversely, the Court finds that the testimony of Mr. Perez Carbajal was not entirely credible as will be discussed in more detail below. The Court now turns to the testimony and evidence adduced at the suppression hearing, which is fairly summarized as follows.

Initially, each of the Government's witnesses presented as an experienced law enforcement officer. First, Jose Calderon was employed with the Los Angeles Police Department ("LAPD") for 20 years prior to his retirement, he was assigned to the Southern California Drug Task Force High Intensity Drug Trafficking Area ("HIDTA") Group 44 for a number of years, and he also was designated as a federal task force officer ("TFO") with the Drug Enforcement Administration ("DEA"). (Docket No. 1652 at 7-8). In these capacities, TFO Calderon participated in thousands of investigations and investigated major narcotics violators. (*Id.* at 8). Next, Robert Poindexter was employed with the Los Angeles County Sheriff's Department for over 28 years. (*Id.* at 71).

He worked as a senior narcotics investigator, and he also was a TFO with the DEA, assigned to HIDTA Group 42. (*Id.*). Additionally, Marco Oropeza was a 25-year veteran of the LAPD, he was part of HIDTA Group 44, and he was also a TFO with the DEA for a number of years. (*Id.* at 122). Finally, Olga Alvarado was an officer with the LAPD for 24 years, she was a member of HIDTA Group 51, and she was a TFO with the DEA for 15 years. (*Id.* at 144).

On the morning of September 2, 2020, TFO Calderon, TFO Poindexter, and other law enforcement officers went to a residence located at 1836½ East 61st Street in Los Angeles, California (the "Residence") to execute a federal arrest warrant for Defendant. (Docket No. 1652 at 9, 71). In the months leading up to that day, other law enforcement officers who participated in the investigation of Defendant, including TFO Oropeza and TFO Alvarado, conducted surveillance of him in the Los Angeles area. (*Id.* at 123, 144-45). TFO Oropeza first explained how he and other members of his HIDTA group conducted surveillance generally and specifically in this case, including that officers utilized information obtained from the Title III wiretap to inform them which areas to surveil. (*Id.* at 123-24). TFO Oropeza next described surveillance of Defendant that occurred on January 29, 2020, beginning at a McDonald's restaurant in Los Angeles. (*Id.* at 124-25). TFO Oropeza followed Defendant's vehicle, which was a dark Nissan Sentra, to various points in the city and ultimately to the Residence, where Defendant pulled into the driveway and parked the vehicle. (*Id.* at 126-129). TFO Oropeza also testified concerning surveillance of Defendant that was conducted on February 24, 2020, beginning at the Residence. (*Id.* at 129-30). Officers observed a Ford SUV depart the Residence, which they followed to a school, where the driver exited the vehicle, and Defendant, who had been the passenger, took over as the driver. (*Id.* at 131). The surveillance team followed Defendant back to the Residence, where he was observed walking from the driveway and getting into the dark Nissan. (*Id.* at 131-32). Law enforcement

eventually conducted a traffic stop of the Nissan, and the driver was positively identified as Defendant. (*Id.* at 132-33). TFO Calderon then described aerial surveillance conducted by a LAPD helicopter on March 26, 2020. (Docket No. 1652 at 44). With that aerial assistance, law enforcement observed Defendant entering the rear of the Residence. (*Id.* at 45-46). Finally, TFO Alvarado described ground surveillance in the area of the Residence on August 6, 2020, when law enforcement observed Defendant depart the driveway of the Residence in a black Ford SUV. (*Id.* at 144-47).

Turning back to the events of September 2, 2020, TFO Poindexter testified that he and other law enforcement officers were assigned to go to the Residence that morning to execute a federal arrest warrant for Defendant. (Docket No. 1652 at 71-72). TFO Calderon's role in the operation was to try to obtain Defendant's consent to search the Residence. (*Id.* at 9). Prior to proceeding to the Residence that morning, law enforcement had an informational briefing during which the officers who were tasked with effectuating the arrest warrant were provided a photograph of Defendant. (*Id.* at 11, 72-73). After the briefing, up to a dozen law enforcement officers arrived at the Residence at 5:00 a.m. (*Id.* at 13, 73, 105). The officers were outfitted in clothing that identified them as law enforcement, and they were armed with their police issued firearms, which is standard operating procedure. (*Id.* at 14-15, 74).

Law enforcement approached the front of the Residence, which actually was located in the backyard.[1] (Docket No. 1652 at 75). Officers banged on the front door of the Residence, loudly identified themselves as law enforcement, and stated that they had an arrest warrant. (*Id.* at 75-76). While waiting for a few moments, an officer stated that two individuals were poking their

1 TFO Poindexter testified concerning Government Exhibit 2, which is an aerial video depicting the Residence and the surrounding area. (Docket No. 1652 at 80-84). TFO Poindexter also testified about Government Exhibit 3, which is a series of photographs depicting various doorways in and around the Residence, including the doorway that was forced upon to gain entry to the Residence. (*Id.* at 84-87).

heads out of an upstairs window. (*Id.* at 76). TFO Poindexter looked up and saw an older man and a younger man, "probably teenager," in an upstairs window for a couple of seconds. (*Id.* at 76-77, 111). Although it was early morning, TFO Poindexter could see the individuals because the sun was starting to rise, and he also shined his flashlight toward the window. (*Id.* at 77, 109, 112). One of the individuals resembled Defendant's photograph that the law enforcement officers were provided during the earlier briefing session. (*Id.* at 77, 111).

Given that law enforcement did not receive a response after banging on the door and loudly announcing their presence, a supervisor gave an order to force the door open, which was done with a pick and ramming device. (Docket No. 1652 at 76, 77, 78, 86). This occurred about 15 to 20 seconds after law enforcement saw Defendant and the younger male in the upstairs window of the Residence. (*Id.* at 78, 110, 112). After the door was opened, TFO Poindexter and other officers, armed with police issued firearms, entered the Residence while continuing to announce their presence every three or four seconds. (*Id.* at 87-88). Defendant, his girlfriend, and his two sons were present inside. (*Id.* at 89). Defendant was handcuffed and eventually separated from the other individuals (*Id.*). The officers conducted a protective sweep of the Residence to ensure that it was clear, and then they removed their tactical gear. (*Id.* at 90, 115, 116).

Up to this point, TFO Calderon had been outside in his vehicle. (Docket No. 1652 at 13). Through the use of two-way radios, TFO Calderon heard what was transpiring, including that the tactical unit observed Defendant in a window of the Residence. (*Id.* at 13, 14, 50).

When TFO Calderon entered the Residence, Defendant was in handcuffs at the kitchen table, but he was not otherwise physically restrained, and no one was pointing a firearm at him. (Docket No. 1652 at 15-16, 51). Upon encountering Defendant, who was "pretty calm," TFO Calderon identified himself as a law enforcement officer, and he also was wearing a tactical vest

that identified him as such. (*Id.* at 16-17, 52-53). As a Spanish speaker certified by the LAPD, TFO Calderon explained to Defendant in Spanish that he was under arrest on a warrant for a narcotics violation, and Defendant expressed an understanding of why he was being arrested. (*Id.* at 17-19, 54). TFO Calderon next asked for Defendant's consent to search the Residence, which Defendant provided in writing, and then he spontaneously stated that narcotics were in the Residence. (*Id.* at 19, 27). After Defendant provided his consent, law enforcement began the search, but they were unable to find the narcotics, and so they asked TFO Calderon to inquire with Defendant where they were located. (*Id.* at 19, 30). At that point, TFO Calderon read Defendant his *Miranda* rights, and he waived his rights. (*Id.*).

Relative to Defendant's consent to search and relinquishment of *Miranda* rights, TFO Calderon testified about Government Exhibit 1, which consisted of the following four pages: page one is "the *Miranda* page;" page two is a consent form for the Residence; page three is another consent form for a 2017 black Nissan and a 2002 white Honda (the "Vehicles"); and page four is a "consent form" for a black Ford Explorer.[2] (Docket No. 1652 at 20-21). All the forms are written in Spanish. (*Id.*).

TFO Calderon first testified about the consent to search form for the Residence. (Docket No. 1652 at 21-22). The first paragraph of the form identifies the Residence as the place to be searched. (*Id.* at 22). TFO Calderon read and showed this information to Defendant, and he expressed an understanding of it. (*Id.* at 22-23). TFO Calderon further explained to Defendant that law enforcement sought to search the entire Residence. (*Id.* at 23). Defendant gave his consent to search the Residence by signing the form at 5:22 a.m., and TFO Calderon and TFO Poindexter signed the form as witnesses. (*Id.* at 23-24, 93-94). When TFO Calderon explained the consent

2 Defendant's girlfriend signed the consent form for the black Ford Explorer. (Docket No. 1652 at 64). TFO Calderon testified that nothing of evidentiary value was taken from that vehicle. (*Id.* at 65).

to search form to Defendant, he was calm and cooperative, he did not appear upset, disoriented or confused, he did not ask any questions about the form, he never equivocated about his consent, nor did he ever revoke it. (*Id.* at 25, 97, 98). Furthermore, no threatening behavior was directed toward Defendant when he signed the consent form to search the Residence, and no one promised him anything in exchange for his consent. (*Id.* at 98).

TFO Calderon subsequently asked Defendant for consent to search the Vehicles by presenting him with another consent to search form. (Docket No. 1652 at 30-31). The first paragraph of the form identifies a 2017 black Nissan Sentra and a 2002 white Honda Accord as the Vehicles to be searched. (*Id.* at 31). Defendant gave his consent to search the Vehicles by signing the form at 5:38 a.m., and TFO Calderon and TFO Poindexter signed the form as witnesses. (*Id.* at 31-32, 94-95). Once again, Defendant was calm and cooperative, he did not appear upset, emotional, confused or disoriented, he did not ask any questions about the search of the Vehicles, and he never equivocated about his consent, nor did he ever revoke it. (*Id.* at 31-32, 43, 98). When Defendant provided consent to search, law enforcement did not apply any physical force or threaten him in any way, nor did they promise him anything in exchange for his consent. (*Id.* at 34).

After Defendant provided consent to search the Vehicles, one of the officers asked TFO Calderon to inquire with Defendant where the narcotics were located because they had been unable to find them. (Docket No. 1652 at 34). At that point, TFO Calderon read Defendant his *Miranda* rights and also presented him with the *Miranda* rights form written in Spanish, which specifies that the individual has the right to remain silent, that whatever he says can be used against him at trial, that he has the right to have an attorney present during questioning, and that an attorney will be provided if he cannot afford one. (*Id.* at 34-36). When TFO Calderon read the *Miranda* form

to Defendant, he was calm and cooperative, he did not appear upset, disoriented or confused, and he did not ask any questions concerning his rights. (*Id.* at 39, 98). The form asks if the individual understands the enumerated rights, to which the response was yes, and Defendant also initialed next to the statements delineating each of his rights, signifying that they were read to him and that he understood them. (*Id.* at 36-38). Defendant signed the *Miranda* form at 6:03 a.m., and TFO Calderon and TFO Chris Romash signed the form as witnesses. (*Id.* at 38-39). When Defendant executed the *Miranda* form, law enforcement did not apply any physical force or threaten him in any way, nor did they promise him anything in exchange for the relinquishment of his rights. (*Id.* at 40). Importantly, after TFO Calderon read Defendant his *Miranda* rights, he did not invoke them at any time. (*Id.* at 39). Rather, Defendant made statements advising law enforcement where the narcotics were located in the Residence, he accompanied the officers to show them their location in a bedroom, and the officers then seized multiple kilograms of cocaine. (*Id.* at 40-41, 100, 101). Bulk U.S. currency and a firearm also were found upstairs in the Residence. (*Id.* at 101). Additionally, the Vehicles were searched, and significant kilogram quantities of cocaine were found in an after-market hidden compartment, which Defendant had explained how to access. (*Id.* at 41-42, 103, 104). Defendant was calm and cooperative while showing law enforcement where the narcotics were located in the Residence and how to access the after-market hidden compartment in one of the Vehicles. (*Id.* at 102, 103).

Next, Defendant's son, Mr. Perez Carbajal, testified for the defense. On September 2, 2020, Mr. Perez Carbajal and his brother, Angel, who were both 16 years old at the time, were at the Residence, along with Defendant and his girlfriend. (Docket No. 1923 at 8, 10, 29-30). Mr. Perez Carbajal woke up to loud thumping sounds, looked out the window of his bedroom which he shared with Angel, and saw "a whole bunch of cops." (*Id.* at 10-11, 29, 31, 32). It was dark

outside, and Mr. Perez Carbajal did not hear any announcements. (*Id.* at 12, 32). According to Mr. Perez Carbajal, he and Angel, who also had woken up, were the only two people who looked out the window for 30 seconds to a minute by opening up the curtain a bit and peeking out. (*Id.* at 12-13, 14-15, 33). While at the window, officers pointed weapon-mounted flashlights in their direction. (*Id.* at 14-15, 34). Mr. Perez Carbajal testified that Defendant did not look out the window. (*Id.* at 37, 43).

As for their physical appearance, Angel is taller than Mr. Perez Carbajal. (Docket No. 1923 at 14, 30). When asked on direct examination whether either one of them had facial hair on September 2, 2020, Mr. Perez Carbajal testified that he did, but he did not mention that Angel also had facial hair. (*Id.* at 14). Nonetheless, Mr. Perez Carbajal later testified on cross-examination that Angel had facial hair, which he described as a "[s]cruffy beard." (*Id.* at 30). In the Court's estimation, Mr. Perez Carbajal's description of Angel's appearance was either initially incomplete or it was inconsistent. Either way, the discrepancy calls into question Mr. Perez Carbajal's testimony about who he claims was looking out the window on September 2, 2020.

Mr. Perez Carbajal next testified that he and his brother knocked on Defendant's bedroom door to wake him up and let him know officers were at the Residence. (Docket No. 1923 at 15, 17, 18, 36). Mr. Perez Carbajal testified that he felt scared and panicked, yet he conceded that he took time to knock on Defendant's bedroom door because it is common courtesy. (*Id.* at 36). While it certainly is courteous to knock before entering someone's bedroom, it is illogical that a scared and panicked teenager would take time to knock before entering his father's bedroom to alert him that the police were at their home and knocking down the front door. In the Court's estimation, this aspect of Mr. Perez Carbajal's testimony simply does not withstand a common-sense test of reason and logic, thereby undermining his credibility to some degree.

By the time Mr. Perez Carbajal and the others got dressed, they encountered officers who were pointing their weapons in the hallway of the Residence. (Docket No. 1923 at 18). Mr. Perez Carbajal received a profane response to his inquiry whether the officers had a search warrant. (*Id.* at 20). Mr. Perez Carbajal supposedly stated that he was a minor and not a threat, but an officer grabbed him and slammed him against a wall, took his phone and wallet out of his pocket, handcuffed him, and then took him outside, where he sat for approximately four hours. (*Id.* at 20-21, 22-23, 39). Mr. Perez Carbajal conceded that he had a "huge altercation" with one of the officers concerning their treatment of him. (*Id.* at 24). He also admitted on cross-examination that he was upset with law enforcement's "handling of the situation, of handling myself," and that he yelled at them and used profanity. (*Id.* at 28, 40).

Overall, the Court finds that Mr. Perez Carbajal's testimony was not entirely credible considering his obvious vested interest in the outcome of Defendant's case. Additionally, while Mr. Perez Carbajal was understandably distressed about the events of September 2, 2020, his candid admission that he was upset with law enforcement and yelled at them calls into question whether his testimony was colored by a certain level of bias. Furthermore, certain aspects of Mr. Perez Carbajal's testimony were contradicted by the credible testimony of the law enforcement officers who were at the scene (such as, for instance, the fact that they loudly announced their presence before forcibly entering the Residence), and some of his own testimony was inconsistent and otherwise does not withstand a common-sense test of reason and logic for the reasons discussed. *See Murphy*, 402 F. Supp. 2d at 569.

It the Court's estimation, the foregoing fairly summarizes the witnesses' testimony adduced and the documentary evidence admitted at the suppression hearing. With this background, the Court turns to analyze Defendant's suppression claims.

## II. MOTION TO SUPPRESS EVIDENCE

Defendant seeks to suppress evidence seized from searches of the Residence and the Vehicles on September 2, 2020, claiming that law enforcement unlawfully entered the Residence and coerced him to give consent to search the Residence and the Vehicles in violation of his Fourth Amendment rights. (Docket Nos. 1388, ¶ 11; 1962 at 9-13). The Government counters that law enforcement lawfully entered the Residence, given that they had a valid warrant to arrest Defendant, probable cause that the Residence was being utilized by him, and probable cause that he was present in the Residence before they entered, and the evidence was seized pursuant to Defendant's voluntary consent to search the Residence and the Vehicles. (Docket Nos. 1440 at 10-15; 1960 at 11-25). For reasons that follow, the Court finds that there is no basis to suppress the evidence seized from the Residence and the Vehicles on September 2, 2020, because no Fourth Amendment violation occurred.

### A. Legal Standard

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. CONST. amend. IV. In order to suppress evidence, the defendant has the burden of establishing that his Fourth Amendment rights were violated. *United States v. Acosta*, 965 F.2d 1248, 1256 n.9 (3d Cir. 1992). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). The burden of proof is preponderance of the evidence. *United States v. Mastronardo*, 987 F. Supp. 2d 569, 575 (E.D. Pa. 2013) (citing *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974)).

Here, it is undisputed that law enforcement searched the Residence and the Vehicles

without a warrant. Therefore, it is the Government's burden to show by a preponderance of the evidence that law enforcement lawfully entered the Residence and that Defendant voluntarily consented to a search the Residence and the Vehicles. For reasons that follow, the Court finds that the Government has sustained its burden.

**B. <u>Law Enforcement Lawfully Entered the Residence on September 2, 2020</u>**

The Supreme Court has held that law enforcement must have an arrest warrant, but not a search warrant, to enter the residence of a wanted individual because "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York,* 445 U.S. 573, 603 (1980). The Third Circuit Court of Appeals has held that "reasonable belief in the *Payton* context embodies the same standard of reasonableness inherent in probable cause." *United States v. Vasquez-Algarin*, 821 F.3d 467, 480 (3d Cir. 2016) (internal quotation marks and citations omitted). Consequently, "law enforcement armed with only an arrest warrant may not force entry into a home based on anything less than probable cause to believe an arrestee resides at and is then present within the residence." *Id.* In accordance with this authority, so long as law enforcement in this case had (1) probable cause to believe that Defendant resided at the Residence, and (2) probable cause to believe that he was present therein on the morning of September 2, 2020, the Fourth Amendment permitted them to enter the Residence in order to execute the arrest warrant.

Defendant does not dispute the fact that law enforcement had an arrest warrant for him. Defendant also does not contest that law enforcement had probable cause to believe that he resided at the Residence. (*See* Docket No. 1962 at 11) (contending only that the Government did not meet its burden to establish that law enforcement had probable cause to believe that Defendant was present in the Residence when they entered). Nor could he do so. TFO Oropeza, TFO Calderon,

and TFO Alvarado each credibly testified about surveillance observations of Defendant accessing the Residence and arriving and departing in various vehicles parked at the Residence in January, February, March, and August 2020, thereby establishing probable cause that he resided there.

Defendant argues, however, that law enforcement did not have probable cause to believe he was present in the Residence when they entered. (*See* Docket No. 1962 at 11). He is incorrect. Importantly, "once the predicate of residency is established, that alone carries significant weight in establishing probable cause to believe the arrestee is present, necessarily reducing the quantum of proof needed to meet *Payton's* second prong in the totality of the circumstances analysis." *Vasquez-Algarin*, 821 F.3d at 481. As just discussed, there is no dispute that Defendant resided at the Residence, which carries significant weight in establishing probable cause to believe that he logically would be there when law enforcement arrived at 5:00 a.m. to execute the arrest warrant. *See United States v. Veal*, 453 F.3d 164, 168 (3d Cir. 2006) (finding probable cause to believe that suspect was present in the residence at the time of arrest where, *inter alia*, "the officers arrived early in the morning, when it was reasonable to expect that residents or guests would still be present"). Further, law enforcement held an informational briefing prior to their arrival at the Residence, during which officers were provided with Defendant's photograph to familiarize themselves with his appearance. (Docket No. 1652 at 11, 72-73). After officers knocked on the front door and loudly identified themselves, stating they had an arrest warrant, an officer noticed two individuals in an upstairs window. (*Id.* at 75-76). TFO Poindexter looked up and saw a teenager and an older man in an upstairs window for a couple of seconds. (*Id.* at 76-77, 111). Although it was early, TFO Poindexter could see because the sun was starting to rise, and he also shined his flashlight toward the window. (*Id.* at 77, 109, 112). One of the individuals resembled

the photograph of Defendant which had been circulated at the earlier briefing session.[3] (*Id.* at 77, 111). The Court finds that these circumstances established probable cause that Defendant was present in the Residence when law enforcement arrived to execute the arrest warrant.

### C. Defendant Voluntarily Consented to a Search of the Residence and the Vehicles

The general rule is that warrantless searches and seizures inside a home are presumptively unreasonable. *See Payton*, 445 U.S. at 586. That rule, however, is subject to certain exceptions. "It is ... well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). To justify a search based on consent, the Government "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Id.* at 222.

The Government sustained its burden here. The credible evidence of record establishes that Defendant consented to both a search of the Residence and the Vehicles as shown by the consent to search forms which he executed after TFO Calderon read and showed each form to him. (Docket No. 1652 at 22, 31). TFO Calderon spoke to Defendant in Spanish, which is his first language, and the forms were written in Spanish. (*Id.* at 22, 31). Defendant expressed an understanding of the forms, he did not ask any questions about them, and he signed the forms as witnessed by TFO Calderon and TFO Poindexter. (*Id.* at 23-25, 31, 32, 93-94). Defendant never equivocated about his consent to search the Residence and the Vehicles, nor did he ever revoke his consent after he signed the forms. (*Id.* at 25, 32, 43).

Having determined that Defendant gave consent to search the Residence and the Vehicles, we next consider whether his consent was voluntary. Consent to a search is valid if it is voluntary,

---

3 As already discussed, the Court does not find credible Mr. Perez Carbajal's testimony suggesting that it was his brother, rather than Defendant, who law enforcement saw in an upstairs window of the Residence on the morning of September 2, 2020.

meaning that it must not be coerced, by explicit or implicit means, or by implied threat or covert force. *Schneckloth*, 412 U.S. at 228, 248. Whether consent to search was voluntarily given "is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. Factors to consider include the age, education and intelligence of the accused, whether he was advised of his constitutional rights, the length of the encounter, the repetition or duration of the questioning, and the use of physical punishment. *Id.* at 226; *see also United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994). The Third Circuit Court of Appeals also identified as relevant "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions." *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009). Finally, law enforcement is not required to advise a defendant of his right to refuse consent before eliciting his consent. *Kim*, 27 F.3d at 955 (citing *Schneckloth*, 412 U.S. at 231–34).

Considering the totality of the circumstances here, the Court concludes that Defendant's consent to search the Residence and the Vehicles was given freely and voluntarily. First, nothing in the record indicates that Defendant's age, educational background, or intelligence in any way limited his ability to voluntarily consent to the searches. TFO Calderon spoke to Defendant in Spanish and read and showed him the consent to search forms, which were written in Spanish. (Docket No. 1652 at 22, 31). Thus, Defendant was advised of his constitutional rights prior to providing consent to search. There was no repeated or prolonged questioning by TFO Calderon prior to Defendant providing consent. After TFO Calderon read and showed Defendant the consent to search forms, Defendant signed them in each instance, thereby indicating that he voluntarily consented to a search of the Residence and the Vehicles. When Defendant provided consent, he was calm and cooperative, and he did not appear upset, disoriented, or confused. (*Id.* at 25, 31-32, 97, 98). Although Defendant initially was handcuffed, he was not otherwise

restrained in any manner when he provided consent, and no threatening behavior was directed toward him, nor was he promised anything in exchange for his consent. (*Id.* at 34, 98). Under these circumstances, there is no basis to suppress the evidence seized by law enforcement during the consent searches of the Residence and the Vehicles.

## III. <u>MOTION TO SUPPRESS STATEMENTS</u>

Defendant next contends that he provided incriminating statements while in custody on September 2, 2020, without having received *Miranda* warnings in violation of his Fifth Amendment rights. (Docket Nos. 1388, ¶¶ 11, 12; 1962 at 14-20). According to the Government, there is no Fifth Amendment violation concerning Defendant's statements because TFO Calderon advised him of his *Miranda* rights in Spanish, he expressed an understanding of his rights, and he voluntarily agreed to speak with the agents. (Docket Nos. 1440 at 16-17; 1960 at 25-26). The Court finds that the Government sustained its burden of establishing by a preponderance of the evidence that Defendant made a spontaneous statement that did not implicate *Miranda*, and he subsequently was properly *Mirandized* and waived his rights, thus no Fifth Amendment violation occurred. *See United States v. Valenta*, Crim. No. 15-161, 2017 WL 2131375, at *4 (W.D. Pa. May 17, 2017) (" . . . [T]he government must prove by a preponderance of the evidence that there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or ... [the defendant] ... was properly *Mirandized* and waived his rights.") (internal quotation marks and citation omitted). The Court further finds that Defendant's statements were voluntary, thus suppression is not warranted.

### A. <u>Legal Standard – Fifth Amendment</u>

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. To advance this legal protection,

in *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." It follows that a defendant who "has been taken into custody or otherwise deprived of his freedom of action in any significant way" must be given the warnings prescribed in *Miranda*, including the right to remain silent and the right to counsel. *Id.* at 444, 468-70. Under *Miranda*, "a statement made by a suspect in response to custodial interrogation after he or she has elected to remain silent is inadmissible at trial." *United States v. Brownlee*, 454 F.3d 131, 146 (3d Cir. 2006).

### B. Defendant's Spontaneous Statement That Narcotics Were in the Residence Made Prior to Receiving *Miranda* Warnings is not Subject to Suppression

As TFO Calderon testified, after Defendant provided written consent to search the Residence, he spontaneously stated that narcotics were in the Residence. (Docket No. 1652 at 19, 27). At the time, Defendant had not yet received *Miranda* warnings. (*Id.* at 27). Defendant takes issue with the fact that TFO Calderon did not immediately administer *Miranda* warnings after he was placed under arrest, but instead requested consent to search the Residence and only later administered *Miranda* warnings. (Docket No. 1962 at 16, 18). According to Defendant, his statement that narcotics were in the Residence was not a spontaneous utterance, but rather a response to TFO Calderon's request for consent to search the Residence, which he maintains was the functional equivalent of interrogation. (*Id.*). Given that Defendant was not *Mirandized* when he stated that narcotics were in the Residence, he maintains that statement should be suppressed. (*Id.*). Defendant is incorrect.

"[T]he special procedural safeguards outlined in *Miranda*" are required only where a suspect is taken into custody and "subjected to interrogation." *Rhode Island v. Innis*, 446 U.S.

291, 300 (1980). Interrogation means "express questioning or its functional equivalent . . . any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Brownlee*, 454 F.3d at 146 (quoting *Innis*, 446 U.S. at 300-01). However, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Innis*, 446 U.S. at 299-300 (quoting *Miranda*, 384 U.S. at 478); *United States v. Fioravanti*, 412 F.2d 407, 414 (3d Cir. 1969) (*Miranda* does not apply to "a situation where one, not under stress of interrogation, simply volunteers a statement which perchance turns out to be inculpatory."). Accordingly, "[u]nder *Miranda* and its progeny, . . . spontaneous utterances are clearly admissible, even when the suspect is in custody, because there is no 'interrogation.' " *United States v. Coates*, 457 F. Supp. 2d 563, 570 (W.D. Pa. 2006).

There is no dispute that Defendant already was placed under arrest and therefore was in custody when he stated that there were narcotics in the Residence. However, the record evidence makes clear that Defendant was not subject to express questioning by TFO Calderon, or its functional equivalent, when he made that statement. Contrary to Defendant's contention that TFO Calderon's request for consent to search the Residence was the functional equivalent of interrogation, (*see* Docket No. 1962 at 16), courts within the Third Circuit and elsewhere around the country repeatedly have held that a law enforcement officer's request for consent to search is not the functional equivalent of interrogation. *See United States v. Benjamin*, No. CR 2017-0010, 2018 WL 6840150, at *12 (D.V.I. Dec. 30, 2018) ("A majority of circuit courts which have considered the matter have found that a request to search is not an interrogation because a consent to search is not an incriminating statement under the Fifth Amendment due to its non-testimonial and non-communicative nature."); *United States v. Jones*, No. CR 13-252, 2016 WL 3067010, at

*12, n.10 (W.D. Pa. June 1, 2016) ("A police officer's request for consent is not an interrogation invoking a suspect's Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), for the simple reason that the giving of consent is not a self-incriminating statement.") (citing *Schneckloth*, 412 U.S. at 232) (explaining that requesting consent is "far removed from 'custodial interrogation' where, in [*Miranda*], we found that the Constitution required now familiar warnings as a prerequisite to police interrogation," and observing that "in language applicable to the typical consent search, we refused to extend the need for warnings [in *Miranda*]...."); *United States v. Calvetti*, 836 F.3d 654, 663 (6th Cir. 2016) (holding that giving consent to search is not a self-incriminating statement protected by the Fifth Amendment privilege against self-incrimination because it was not "testimonial" or communicative evidence); *United States v. Crisolis-Gonzales*, 742 F.3d 830, 837 (8th Cir. 2014) (request for consent to search was not an attempt to elicit incriminating statements and defendant's statement in response was a volunteered, spontaneous admission); *United States v. Knope*, 655 F.3d 647, 654 (7th Cir. 2011) (holding that "a consent to search is not an interrogation within the meaning of *Miranda*") (citation omitted); *United States v. Scheets*, 188 F.3d 829, 841 (7th Cir. 1999) (ruling that officers were not obligated to apprise the defendant of his *Miranda* rights before asking for his consent to search his car or his motel room); *United States v. Rodriguez–Garcia*, 983 F.2d 1563, 1568 (10th Cir. 1993) ("We hold that a consent to search is not the type of incriminating statement which the Fifth Amendment was designed to address. Consenting to a search is not 'evidence of a testimonial or communicative nature' which would require officers to first present a *Miranda* warning."); *United States v. Tyson*, 360 F. Supp. 2d 798, 809 (E.D. Va. 2005) ("A request for consent to search a suspect's home does not qualify as interrogation."); *see also* Wayne R. LaFave et al., § 6.7(b) Questioning, *2 Crim. Proc.* § 6.7(b) (4th ed.) ("[A] nonaccusatory request that a person consent to a search is likewise not interrogation

under the *Innis* test.").

To repeat, Defendant spontaneously stated that narcotics were in the Residence. (Docket No. 1652 at 19, 27). Suppression of Defendant's spontaneous statement is unwarranted because there was no police interrogation, or its functional equivalent, which prompted it.

### C. <u>**Defendant's Additional Statements Made After He Received *Miranda* Warnings and Voluntarily Waived His *Miranda* Rights are not Subject to Suppression**</u>

Likewise, there is no basis to suppress the additional statements Defendant made after he received *Miranda* warnings and voluntarily relinquished his *Miranda* rights. A defendant who has been advised of, but has not yet invoked, his *Miranda* rights may waive them—provided he does so knowingly, intelligently and voluntarily, given the totality of the circumstances. *See Moran v. Burbine*, 475 U.S. 412, 422-23 (1986). To determine whether a *Miranda* waiver is valid, the Government must establish that "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 421. "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (citation omitted). The Government has "the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver." *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (citing *Colorado v. Connelly*, 479 U.S. 157, 169 (1986)).

The Government met its burden to prove by a preponderance of the evidence that Defendant was given *Miranda* warnings and that he relinquished his *Miranda* rights. TFO Calderon credibly testified that he gave Defendant *Miranda* warnings verbally and via a written form, both in Spanish, before asking about the location of the narcotics within the Residence.

(Docket No. 1652 at 19, 34). TFO Calderon also credibly testified that Defendant voluntarily initialed and executed the written *Miranda* advice of rights form indicating that he read the form, he was advised of his rights, he understood his rights, and he did not invoke any of them. (*Id.* at 35-39). When TFO Calderon administered the *Miranda* warnings, Defendant was in handcuffs, but no law enforcement officer exerted any force upon him, pointed a weapon at him, threatened him, or promised him anything in exchange for him relinquishing his rights. (*Id.* at 40). As TFO Calderon testified, Defendant was calm and cooperative, he did not appear confused, he did not ask any questions concerning his rights, and he did not invoke any of the rights that TFO Calderon explained to him. (*Id.* at 39). After that, Defendant made statements advising law enforcement where narcotics were located in the Residence and Vehicles, he showed them those locations, and he explained how to access narcotics that were in an after-market hidden compartment of a vehicle. (*Id.* at 40-42). Law enforcement then located and seized significant kilogram quantities of cocaine in the Residence and in the aftermarket compartment of one of the Vehicles. (*Id.* at 41-42).

The evidence of record establishes that Defendant was advised of his *Miranda* rights in verbal and written form, he understood his rights, and he voluntarily relinquished them and agreed to speak with law enforcement. The evidence additionally establishes that Defendant's decision to relinquish his rights was "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and his waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran,* 475 U.S. at 421. In particular, the *Miranda* advice of rights form executed by Defendant is "strong proof" of the validity of his waiver of rights. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient

to establish waiver."). Accordingly, the Court finds that Defendant voluntarily relinquished his *Miranda* rights and then made statements to law enforcement about the location of narcotics in the Residence and the Vehicles.

**D. <u>Defendant's Statements Were Voluntary</u>**

Statements not obtained in violation of one's *Miranda* rights are nonetheless subject to suppression as violative of due process if the statements are coerced or involuntary. *Arizona v. Fulminante*, 499 U.S. 279, 288–91 (1991). A statement is coerced or involuntary if the behavior of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961); *Fulminante*, 499 U.S. at 288 (A statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion."). Whether a statement is voluntarily made is determined from "the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation." *Schneckloth*, 412 U.S. at 226. Factors relevant to that determination include: whether the police engaged in coercive activity; the length, location and continuity of the interrogation; the age, education, physical and mental condition of the defendant; and whether the police advised the defendant of his rights to remain silent and have counsel present during an interrogation. *See Withrow v. Williams*, 507 U.S. 680, 693 (1993). The overriding question in evaluating voluntariness is whether the law enforcement officer's tactics and statements "were so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess." *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986). It is the Government's burden to show by a preponderance of the evidence that the challenged statements are voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *United States v. Ludwikowski*, 944 F.3d 123, 135 (3d Cir. 2019).

Considering the totality of the circumstances here, the Court concludes that the Government satisfied its burden to show that Defendant's statements on September 2, 2020 were voluntary. Although Defendant was under arrest when he made the statements, there is no evidence that he was threatened or subjected to any form of physical punishment. Defendant was advised of his constitutional rights via *Miranda* warnings, and there is nothing in the record indicating that his age, educational background, intelligence, physical condition, or mental condition in any way limited his ability to voluntarily speak with TFO Calderon. Consequently, the Court finds that Defendant's statements to law enforcement on September 2, 2020 were voluntary under the totality of the circumstances, and therefore his statements are admissible at trial.

## IV. CONCLUSION

The Government sustained its burden to show, by a preponderance of the evidence, that law enforcement lawfully entered the Residence on September 2, 2020, and Defendant voluntarily consented to a search of the Residence and the Vehicles. The Government likewise sustained its burden to establish, by a preponderance of the evidence, that Defendant's statements that day were either spontaneously made or were properly obtained following administration of *Miranda* warnings and Defendant's waiver of his rights. For these reasons, there is no basis to suppress any evidence seized or statements obtained from Defendant on September 2, 2020, and his Motion to Suppress, (Docket No. 1388), is denied in all respects.

An appropriate Order follows.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Date: November 13, 2026

cc/ecf: All counsel of record